UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| THOMAS CLOBES, an individual, | ) ) ) |
| *Plaintiff,* | ) ) ) Case No. _____ |
| v. | ) ) |
| 3M COMPANY, | ) ) **VERIFIED COMPLAINT** |
| *Defendant.* | ) ) **[JURY TRIAL DEMANDED]** ) |

1. Plaintiff Thomas Clobes seeks relief from Defendant 3M Company's pattern of discriminatory and illegal behavior against employees who hold sincere religious and medical objections to 3M's COVID-19 vaccination mandate.

2. In October 2021, Defendant imposed an unnecessary, draconian vaccine mandate for all employees that addresses a very remote risk: asymptomatic deadly spread of COVID-19 to fellow employees, by a method (vaccination) that poses a higher risk of deadly spread of COVID-19 than asymptomatic spread.

3. Defendant refused to accept Plaintiff's exemption request and discriminated against him in violation of federal and Minnesota law by engaging in harassment and creating a hostile work environment due to Plaintiff's sincere religious objections to the COVID-19 vaccine.

4. Plaintiff respectfully implores this Court to order that Defendant comply with the laws protecting the rights of the citizens of Minnesota against precisely such employment discrimination.

1

## PARTIES

5. Plaintiff Thomas Clobes ("Clobes" or "Plaintiff") was employed as a process specialist at 3M's facility in Hutchinson, Minnesota. Clobes is a resident of Wright County, Minnesota. Clobes was subjected to discriminatory treatment, harassment, and a hostile work environment due to Defendant's COVID-19 vaccine mandate.

6. 3M Company ("3M" or "Defendant") is a technology company that manufactures health, safety, industrial and consumer products. As of 2021, 3M employed nearly 100,000 employees worldwide. 3M is headquartered in Saint Paul, Minnesota.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e *et seq*.

8. This Court has supplemental jurisdiction over the state claims raised in this matter pursuant to 28 United States Code ("U.S.C.") Section 1367. Plaintiff seeks remedies under the Minnesota Human Rights Act; Minn. Stat. § 363A.08 *et seq*.

9. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this judicial district.

10. An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTS AND BACKGROUND

**3M's Discriminatory Treatment of Plaintiff**

11. In September 2021, Defendant mandated that Plaintiff become fully vaccinated for COVID-19 by December 8, 2021. All salaried employees were subject to the same requirement.

12. Plaintiff was told that he would be terminated if he did not become fully vaccinated.

13. Defendant provided an online questionnaire that allowed employees to request religious and/or medical accommodations and exemptions from the mandate. A third party, Sedgwick, was assisting 3M with the exemption process.

14. As a practicing Christian, Plaintiff has sincere religious objections to receiving a COVID-19 vaccine.

15. Plaintiff submitted his religious accommodation request on November 18, 2021. *See* Exhibit A.

16. Along with his religious objections to the COVID-19 vaccine, Plaintiff is concerned about vaccinations because his six-month-old granddaughter, Evee, died in March 2019, just 36 hours after getting a series of vaccines given to children that age, because the vaccines caused a "cytokine storm" inside her body.

17. 3M did not grant Plaintiff's request for a religious accommodation.

18. Instead, 3M human resources personnel sent him a list of questions to further evaluate his request. *See* Exhibit B. In his answers, Plaintiff informed Defendant that he had already been infected with and has antibodies for SARS-CoV-2.

19. Plaintiff was harassed daily by email and loudspeaker announcements while at work to receive the COVID-19 vaccine. Because of his granddaughter's vaccine-induced death, such pressure to take the vaccine caused emotional trauma and stress to Plaintiff.

20. Because he wasn't vaccinated, Plaintiff was required to wear a mask. Like a "Scarlet Letter," this singled him out as unvaccinated to his co-workers.

21. Plaintiff had to join a number of support groups due to the stress caused by the persistent workplace pressure to get vaccinated for COVID-19.

22. Training video images of people getting injected with the vaccine made Plaintiff physically ill.

23. Plaintiff wrote in his follow-up questionnaire: "Because of my personal family tragedy I have prayed to God and his guidance has [led] me to hold a sincere and genuine belief that this vaccine and any vaccine are a danger to my health and mental well-being,"

24. Plaintiff also shared the story of his granddaughter's vaccine-related death with 3M officials at the manufacturing plant at which he worked in a December 3, 2021, email. *See* Exhibit C.

25. On Friday, December 10, 2021, Clobes got an email from a 3M official that the vaccine mandate had been lifted, consequential to the Federal Contractor Mandate being enjoined.

26. Nevertheless, Clobes continued to be pressured to get fully vaccinated.

27. Plaintiff suffered emotional distress, because of a continual fear that he was going to be terminated for not taking the vaccine.

28. Plaintiff felt discriminated against because he had to justify not taking a COVID-19 vaccine.

29. Plaintiff felt as though his religious beliefs were on trial for not wanting to take an experimental and potentially dangerous injection.

30. Plaintiff was a loyal employee who worked for 3M for 25 years.

31. He questions why he had to undergo such a stressful situation and justify his religious beliefs.

32. Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").

33. Plaintiff received a Notice of Right to Sue from the EEOC on October 21, 2022. *See* Exhibit D. This Complaint has followed.

**COVID-19 Vaccines Manufacturing Process**

34. Presently, all COVID-19 vaccines have made use either in production or testing of fetal cell lines developed from tissues derived from aborted fetuses (see excerpt below).[1]



35. For example, the Johnson & Johnson vaccines used fetal cell cultures, specifically PER.C6, a retinal cell line that was isolated from a terminated fetus in 1985.[2]

36. In an interview with WREG-TV, Dr. Steve Threlkeld, president of the medical staff at Baptist Hospital in Memphis, Tennessee, acknowledged fetal cell lines used to

---

[1] *See,* Los Angeles County Public Health, *COVID-19 Vaccine and Fetal Cell Lines*, http://publichealth.lacounty.gov/media/Coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf (last accessed August 26, 2021)

[2] Are the vaccines made with fetal cells, Institute for Clinical Systems Improvement, https://www.icsi.org/covid-19-vaccine-faq/are-the-mrna-vaccines-made-with-fetal-cells/ (last accessed August 26, 2021), see also, Tennessee Department of Health, Fact v. Fiction: Johnson & Johnson Vaccine(2021) available at https://covid19.tn.gov/stay-informed/blogs/fact-v-fiction-johnson-johnson-vaccine/ (last visited Sept. 27, 2021) (acknowledging the Johnson & Johnson vaccine was developed from a fetal cell line).

produce or test the Johnson & Johnson COVID-19 vaccines "were actually recovered from an aborted fetus in the 70s or 80s and there are several of these cell lines."[3]

37.     The Louisiana Department of Health likewise confirms that the Johnson & Johnson COVID-19 vaccine used the PER.C6 fetal cell line, which "is a retinal cell line that was isolated from a terminated fetus in 1985."[4]

38.     As for the EUA-Pfizer and Moderna COVID-19 vaccines, fetal cell line HEK 293 was used during the research and development phase.[5] All HEK 293 cells are descended from tissue taken in 1973 from either an abortion or miscarriage[6] that took place in the Netherlands.[7]

**Requiring the COVID-19 Vaccine as a Condition of Employment is Unnecessary and Poses Significant Risk**

*The COVID-19 Vaccine Does Not Prevent Infection or Transmission*

39.     The COVID-19 vaccine has been ineffective at preventing the transmission and infection of SARS-CoV-2.

40.     A study published in the European Journal of Epidemiology analyzing data from 68 countries and 2,947 counties in the United States found "no discernable relationship

---

[3] WREG, *State: Fetal cell lines, not fetal tissue, were used to make Johnson & Johnson vaccine* (March 5, 2021) available at https://www.wreg.com/news/state-fetal-cell-lines-not-fetal-tissue-was-used-to-make-johnson-johnson-vaccine/ (last visited Sept. 27, 2021).

[4] La. Dept of Public Health, *You Have Questions, We Have Answers: COVID-19 Vaccine FAQ* (Dec. 21, 2020), https://ldh.la.gov/assets/oph/Center-PHCH/Center-PH/immunizations/You_Have_Qs_COVID-19_Vaccine_FAQ.pdf (emphasis added) (last visited Oct. 24, 2022).

[5] *See*, Nebraska Medicine, *You asked, we answered: Do the COVID-19 vaccines contain aborted fetal cells?*, https://www.nebraskamed.com/COVID/you-asked-we-answered-do-the-covid-19-vaccines-contain-aborted-fetal-cells, (last visited on Aug. 26, 2021).

[6] *COVID-19 Vaccine and Fetal Cell Lines*.

[7] *Ibid*.

6

between percentage of population fully vaccinated and new COVID-19 cases."[8] Nor was there a significant indication of "COVID-19 case decreases with higher percentages of population fully vaccinated." Rather, they found a "marginally positive association such that countries with higher percentages of population fully vaccinated have higher COVID-19 cases per 1 million people."[9]

41. Indeed, the vaccine has demonstrated *negative effectiveness* and could even increase the risk of infection.[10]

42. Israeli data found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity.[11] Israeli data also indicates the protection BioNTech grants against infection is short-lived compared to natural immunity and degrades significantly faster.

43. A senior Pfizer executive has admitted that Pfizer did not even know whether its mRNA COVID-19 shot stopped transmission before Pfizer began administering it to the public.[12]

---

[8] S.V. Subramanian, et al., *Increases in COVID-19 are unrelated to levels of vaccination across 68 countries and 2947 counties in the United States,* European Journal of Epidemiology (September 9, 2021), available at http://doi.org/10.1007/s10654-021-00808-7.

[9] *Ibid.*

[10] Altarawneh, H., Chemaitelli, H., et al. *Effects of Previous Infection and Vaccination on Symptomatic Omicron Infections,* N. Engl. J. Med. 2022; July 7, 2022, DOI: 10.1056/NEJMoa2203965; Florentino, P., Millington, T., *Vaccine effectiveness of two-dose BNT162b2 against symptomatic and severe COVID-19 among adolescents in Brazil and Scotland over time: a test-negative case-control study,* The Lancet, August 8, 2022, DOI: https://doi.org/10.1016/S1473-3099(22)00451-0; *see* Nass, Meryl, COVID-19 Vaccines Don't Prevent Transmission, Severe Illness or Deaths, Data Show, *The Defender,* April 4, 2022, available at https://childrenshealthdefense.org/defender/covid-vaccines-dont-prevent-transmission-severe-illness-deaths-data/.

[11] David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* Israel National News, (Jul. 13, 2021), available at https://www.israelnationalnews.com/News/News.aspx/309762 (last visited Aug. 26, 2021).

[12] Pfizer did not know whether Covid vaccine stopped transmission before rollout, executive admits, October 13, 2022, *news.com.au*, available at

44. It should, therefore, come as no surprise that in their real-world application, the vaccines have not shown that they are effective at stopping infection or preventing vaccinated persons from spreading the virus.

### *Natural Immunity is Durable, Lasting, and Superior to Vaccination*

45. Natural immunity is robust, durable, and complete against all variations of SARS-CoV-2.

46. There is strong evidence that persons who have been infected with SARS-CoV-2 and recovered are protected from future reinfection for over a year, and potentially have lifelong immunity – unlike vaccinated persons for whom boosters are already being recommended and administered.[13] However, Defendant wholesale disregards the relevance of natural immunity entirely.

47. A bevy of epidemiological studies demonstrate to a reasonable degree of medical certainty that natural immunity following infection and recovery from the SARS-CoV-2 virus provides robust and durable protection against reinfection, at levels equal to or better than the most effective vaccines currently available.[14]

---

https://www.news.com.au/technology/science/human-body/pfizer-did-not-know-whether-covid-vaccine-stopped-transmission-before-rollout-executive-admits/news-story/f307f28f794e173ac017a62784fec414

[13] *See*, Yair Goldberg; Micha Mandel, et al., *Protection of previous SARS-CoV-2 infection is similar to that of BNT162b2 vaccine protection: A three month nationwide experience from Israel*, medRxiv (April 20, 2021) available at https://www.medrxiv.org/content/10.1101/2021.04.20.21255670v1 (last visited on Aug. 26, 2021); *See*, also Jackson S. Turner; Wooseob Kim, et al., *SARS-CoV-2 infection induces long-lived bone marrow plasma cells in humans*, Nature 595 (pp. 421-425) (May 24, 2021).

[14] *See, e.g.* N. Kojima; A. Roshani, et al., *Incidence of Severe Acute Respiratory Syndrome Coronavirus-2 Infection among previously infected or vaccinated employees*, medRxiv (July 3, 2021) available at https://www.medrxiv.org/content/10.1101/2021.07.03.21259976v2 (last visited on Aug. 26, 2021).

48. Israeli researchers conducting a massive group study found exceedingly low reinfection rates for people previously infected with COVID-19.[15] More interestingly, the Israeli scientists found people who receive both doses of the EUA-approved Pfizer shot were up to *13 times more likely to contract the virus than those who were previously infected with the virus* and that "natural immunity confers longer lasting and stronger protection against infection."[16]

49. Consistent with the Israeli research team's findings, the Cleveland Clinic found similar data supporting the strong durability of natural immunity. In June of 2021, the Cleveland Clinic released a study of 1,359 previously infected health care workers. Researchers found a reinfection rate of *zero*, despite some of the studied individuals having been around COVID-positive patients more than the regular population.[17] Not one of the 1,359 previously infected subjects who remained unvaccinated, had a SARS-CoV-2 infection over the duration of the Cleveland Clinic study.[18]

50. The Cleveland Clinic researchers concluded: "*Individuals who have had SARS-CoV-2 infection are unlikely to benefit from COVID-19 vaccination*, and vaccines can be safely prioritized to those who have not been infected before." (emphasis added).[19]

---

[15] *See*, Svian Gazit, et. al., *Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections*, medRxiv, https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1.full.pdf (last visited on Aug. 26, 2021).
[16] *Ibid.*
[17] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).
[18] *Ibid.*
[19] Nabin K. Shrestha, et. al., *Necessity of COVID-19 vaccination in previously infected individuals*, medRxiv, (June 5, 2021) available at https://www.medrxiv.org/content/10.1101/2021.06.01.21258176v2, (last visited on August 26, 2021).

9

51. Given the mounting body of compelling research, it is medically unnecessary for persons who have recovered from COVID-19 and present evidence of natural immunity, to undergo vaccination for SARS-CoV-2. Indeed, it is beneficial for most individuals to be naturally introduced to the virus.

52. Defendant knew or should have known of this early research at the time it implemented its vaccine mandate.

53. Coercing Plaintiff, who may have had natural immunity, to receive the COVID-19 vaccine would not only offer them or those around them little benefit, but it would also subject them to an elevated risk of adverse side effects, including death, as demonstrated below.

***Vaccination Poses Substantial Health Risks***

54. All three of the COVID-19 vaccines available in the United States are based entirely on a limited set of clinical trials. Recent information has revealed that these trials were riddled with massive fraud, falsified data, and negligent and intentional error.

55. There has never been a successful coronavirus vaccine in history.

56. Governmental authorities revised their definition of the word "vaccine" itself in order to continue to label these experimental drugs with novel ingredients because they fail to meet the test of traditionally defined vaccines, which actually inoculated against infection and prevented transmission, neither of which COVID-19 vaccines can any longer claim credit for.

57. Recent reporting data presents an alarming picture: there have been 33,464 deaths reported to VAERS from COVID-19 vaccines and 1,650,216 total adverse events.[20]

58. The input of event reports to VAERS since the COVID vaccines were rolled out is *far greater than all cumulative adverse event reports to VAERS for the prior 30 years*: an alarming statistic.

59. This data is likely staggeringly underestimated, as past attempts to investigate the VAERS reporting rate have suggested that between 1 percent and 13 percent of actual adverse effects get reported; however, because CDC changed VAERS reporting recently to include additional data, it is not possible to estimate the degree of underreporting based on past attempts to do so.[21] The CDC has failed to account for this underreporting.

60. Recent estimates suggest that the rate of injury for vaccinated individuals is 5.1 percent.[22]

61. COVID-19 vaccines have been known to cause a myriad of adverse effects: myocarditis, pericarditis, Guillain-Barre syndrome, antibody-dependent enhancement, fertility concerns, menstrual health issues, and many other conditions.

---

[20] https://wonder.cdc.gov/controller/datarequest/D8;jsessionid=0E84A6725F6EA0434A7910838E0C; Josh Guetzhow, Safety Signals for COVID Vaccines Are Loud and Clear. Why Is Nobody Listening?, THE DEFENDER, (Sept. 29, 2021) available at https://childrenshealthdefense.org/defender/safety-signals-covid-vaccines-full-transparency-cdc-fda/ (last visited Oct. 2, 2021).
[21] Varricchio F, Iskander J, Destefano F, Ball R, Pless R, Braun MM, Chen RT. Understanding vaccine safety information from the Vaccine Adverse Event Reporting System. Pediatr Infect Dis J. 2004 Apr;23(4):287-94. doi: 10.1097/00006454-200404000-00002. PMID: 15071280.
[22] *Horowitz: German insurance claims hint at millions of unreported COVID vaccine injuries*, August 15, 2022, available at https://www.conservativereview.com/horowitz-german-insurance-claims-vaccine-injury-2657863726.html.

62. Especially alarmingly high rates of myocarditis and pericarditis following vaccination have been witnessed in all age groups, but particularly in young males.[23] Stories of young athletes collapsing on the field due to heart problems have plagued the media. Because of underreporting, the risk of myocarditis following SARS-CoV-2 vaccination may be more serious than reported.

63. Furthermore, spike proteins, the putative antigen induced by Pfizer-BioNTech COVID vaccine, are a toxin. They are produced and enter the circulatory system, have predictable negative consequences to vascular endothelium, activate platelets, and cross the blood brain barrier. It would be expected to trigger the destruction of cells that produce it and present it on their surfaces.

64. We now know that vaccine-induced spike proteins circulate throughout the body and accumulate in large concentrations in organs and tissues, including the spleen, bone marrow, liver, adrenal glands, and especially the ovaries.[24] Evidence links spike protein *in vivo* to blood clots, thrombocytopenia, hemorrhages, heart attacks and strokes.

65. The potential adverse effects Plaintiff faced in being coerced to receive the COVID-19 vaccines pursuant to Defendant's mandate are not theoretical, hypothetical or academic—they are very real and have real victims.

---

[23] Krug A, Stevenson J, Høeg TB. BNT162b2 Vaccine-Associated Myo/Pericarditis in Adolescents: A Stratified Risk-Benefit Analysis. Eur J Clin Invest. 2022 May;52(5):e13759. doi: 10.1111/eci.13759. Epub 2022 Mar 4. PMID: 35156705; PMCID: PMC9111575; Gill J, Tashjian R, Autopsy Histopathologic Cardiac Findings in 2 Adolescents Following the Second COVID-19 Vaccine Dose. Arch Pathol Lab Med (2022); 146(8): 925-929. Doi: https://doi.org/10.5858/arpa.2021-0435-SA; Watanabe S, Hama R, SARS-CoV-2 vaccine and increased myocarditis mortality risk: a population based comparative study in Japan. Oct 18 2022, doi: https://doi.org/10.1101/2022.10.13.22281036.

[24] Megan Redshaw, *'We Made a Big Mistake' – COVID Vaccine Spike Protein Travels From Injection Site, Can Cause Organ Damage,* The Defender (June 3, 2021), https://childrenshealthdefense.org/defender/covid-vaccine-spike-protein-travels-from-injection-site-organ-damage/.

66. The empirical evidence and recent studies have provided definitive proof that these vaccines cannot boast safety and effectiveness. In no such circumstances should these experimental medical products be mandated in any setting.

67. Given these proven facts, which were accessible at the time that 3M implemented its vaccine mandate, Defendant knew or should have known that allowing Plaintiff to continue at his positions unvaccinated would not pose a risk or undue burden to 3M.

## FIRST CAUSE OF ACTION
### Religious Discrimination
**[Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.]**

68. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

69. Title VII prohibits "discriminat[ion] against any individual with respect to their compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see also EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).

70. "Employers violate Title VII of the Civil Rights Act of 1964 if they commit, abet, or condone discrimination based on sex or religion that results in a hostile work environment." *Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1076–77 (8th Cir. 2006).

71. "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

72. "[A]n employee's protections under Title VII extend beyond the economic aspects of employment…" *Id.*

73. Plaintiff was subject to harassment on the basis of religion in violation of Title VII due to his objection to receiving the COVID-19 vaccine.

74. Plaintiff belonged to a protected class due to his sincere religious beliefs.

75. Plaintiff was subject to unwelcome harassment, pressure, and coercion by Defendant to receive the COVID-19 vaccine.

76. Plaintiff was in constant fear that he would be terminated and lose his livelihood due to Defendant's vaccination policy.

77. Because of traumatic familial events Plaintiff had witnessed due to vaccine injuries, Plaintiff experienced continual stress and emotional distress while at work.

78. Defendant was aware of Plaintiff's sincere objections to the COVID-19 vaccines as well as Plaintiff's history with vaccine injury. However, Defendant failed to take any action to remedy Plaintiff's distress.

79. Plaintiff's coercion to receive the COVID-19 occurred on a daily basis and Defendant applied persistent pressure via email and announcements.

80. Defendant's conduct created a hostile and abusive work environment and interfered with Plaintiff's job performance by putting him in a constant state of fear and anxiety.

**SECOND CAUSE OF ACTION**
**Religious Discrimination**
**[Violation of the Minnesota Human Rights Act; Minn. Stat. § 363A.08]**

81. Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

82. The Minnesota Human Rights Act ("MHRA") prohibits an employer from "discriminat[ing] against a person with respect to hiring, tenure, compensation, terms,

upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08(subd. 2)(2).

83. Claims of discrimination under the MHRA are analyzed under the same standard as Title VII discrimination. *Said v. Mayo Clinic,* 44 F.4th 1142 (8th Cir. 2022).

84. Defendant discriminated against Plaintiff by creating a hostile and abusive work environment by perpetually pressuring Plaintiff to receive a COVID-19 vaccine and holding him in constant fear of losing his job and livelihood.

85. Plaintiff belonged to a protected class due to his sincere religious beliefs and objections to the COVID-19 vaccine.

86. Plaintiff was subject to unwelcome harassment to receive the COVID-19 vaccine in violation of his religious beliefs.

87. Defendant's harassment of Plaintiff caused him continuous emotional distress and fear.

88. Plaintiff informed Defendant of his sincere objections to the COVID-19 vaccines as well as Plaintiff's history with vaccine injury. However, Defendant failed to take any action to remedy Plaintiff's distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for the following relief:

a. A finding that Plaintiff has a fundamental right to his bodily autonomy, and to make health decisions in accordance with his beliefs and conscience.

b. A finding that Defendant discriminated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 and the Minnesota Human Rights Act.

c. Enjoin Defendant from taking any further adverse employment action against Plaintiff;

d. Enjoin Defendant from engaging in other similar harassment or adverse employment action against any other 3M employee;

e. An order that Plaintiff be compensated, to the extent allowable under Minnesota state and Federal law, for his monetary damages;

f. An order that Defendant pays Plaintiff's costs associated with bringing this lawsuit, including his reasonable attorneys' fees and costs; and

g. A grant of any such further relief as the Court deems necessary and proper in the public interest.

DATED: January 19, 2023

        Respectfully submitted,

        */s/Francis Herbert III*
        Francis Herbert White III, Esq.
        Minn. Atty. #0396779
        Francis White Law, PLLC
        8362 Tamarack Village, Suite 119-220
        Woodbury, MN 55125
        (651) 829-1431 (office)
        francis.white@franciswhitelaw.com

        Robert Barnes, Esq.
        Tennessee BPR No. 020617
        *Subject to admission pro hac vice*
        Lexis Anderson, Esq.
        Texas Bar No. 24127016
        *Subject to admission pro hac vice*
        BARNES LAW
        700 South Flower Street, Suite 1000
        Los Angeles, California 90017
        Telephone: (310) 510-6211
        Email: robertbarnes@barneslawllp.com

        **Counsel for Plaintiff THOMAS CLOBES**

## VERIFICATION

I, Thomas Clobes, am over the age of eighteen years and am a former employee of 3M Company. The statements and allegations that pertain to me or which I make in this VERIFIED COMPLAINT are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently. I declare under penalty of perjury, under the laws of the United States and the State of Minnesota, that the foregoing statements are true and correct to the best of my knowledge.

Dated: January 18, 2023

*/s/ Thomas Clobes*

Thomas Clobes