```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      -----------------------------------------------------------
 3                                     )
      Thomas Clobes,                   )  File No. 23-cv-158
 4                                     )            (NEB/DTS)
             Plaintiff,                )
 5                                     )
      v.                               )
 6                                     )  Courtroom 13W
      3M Company,                      )  Minneapolis, Minnesota
 7                                     )  Thursday, April 20, 2023
             Defendant.               )  1:30 p.m.
 8                                     )
      -----------------------------------------------------------
 9
               BEFORE THE HONORABLE NANCY E. BRASEL
10         UNITED STATES DISTRICT COURT DISTRICT JUDGE
                 (MOTIONS HEARING - DOCKET NO. 11)
11
      APPEARANCES:
12      For Plaintiff:          BARNES LAW LLP
                                BY:  LEXIS ANDERSON
13                              700 South Flower Street, #1000
                                Los Angeles, California 90017
14

15      For Defendant:          OGLETREE DEAKINS NASH SMOAK &
                                    STEWART P.C.
16                              BY:  PATRICK R. MARTIN
                                225 South Sixth Street, #1800
17                              Minneapolis, Minnesota 55402

18

19      Court Reporter:         RENEE A. ROGGE, RMR-CRR
                                United States District Courthouse
                                300 South Fourth St., Box 1005
20                              Minneapolis, Minnesota 55415

21
           Proceedings recorded by mechanical stenography;
22      Transcript produced by computer.

23                              *   *   *

24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3          THE COURT:  We are on the record.  The case before

4     us today is Thomas Clobes --

5          MS. ANDERSON:  Clobes.

6          THE COURT:  Clobes.

7          -- Clobes versus 3M Company, and the case number

8     is 23-cv-158.

9          May I please have appearances, beginning with the

10    plaintiff.

11         MS. ANDERSON:  Yes.  Good afternoon, Your Honor.

12    Lexis Anderson with Barnes Law on behalf of plaintiff Thomas

13    Clobes.

14         THE COURT:  Good afternoon.

15         And for the defense.

16         MR. MARTIN:  Good afternoon, Your Honor.  Pat

17    Martin from Ogletree Deakins on behalf of defendant 3M.

18         THE COURT:  Good afternoon.

19         We are here on a motion to dismiss that was filed

20    by 3M.  I'd like to actually begin, however, with the

21    plaintiff, because I have some questions about the response.

22    And obviously 3M's had the last word, because they have

23    filed a reply brief.

24         So why don't you take the podium first,

25    Ms. Anderson.

1          MS. ANDERSON:  Yes, Your Honor.

2          THE COURT:  So I am concerned about the complaint

3    here because I am struggling to find an inference between

4    the -- or a link between the actions that were taken by 3M,

5    the emails and the loudspeaker and the mask requirement, any

6    link between that and religion.  And so that obviously has

7    to happen in order to state a discrimination claim.  And I'm

8    wondering if you can speak to that.

9          MS. ANDERSON:  Yes, Your Honor.

10          So Mr. Clobes did have sincere religious

11    objections to the vaccine mandate, which was what all of

12    these announcements and pressuring of employees to take the

13    vaccine was all about, was 3M's overarching mandate.  And

14    Mr. Clobes' health objections, he filed for religious

15    exemption from 3M, was very open about his religious

16    objections, including the use of aborted fetal cells, his

17    own personal family connections with his granddaughter and

18    her vaccine death.  And he went through all of the steps

19    required to seek exemptions because of his experience, his

20    religious beliefs and was very open with 3M about that.

21          His religious exemption was denied.  And even

22    still, you know, he was really subjected to constant

23    coercion from 3M to get vaccinated under threat of

24    termination.  So Mr. Clobes was under the impression for

25    several months that he was going to be terminated because of

1    his sincere religious objections to the vaccine with no

2    recourse.  He went through all of the required steps in

3    order to seek an exemption, was blocked at every direction.

4    And so that causal connection -- he was terminated as a

5    result because of 3M's unwillingness to grant his religious

6    exemption, have that individualized assessment of his

7    sincere religious beliefs.

8         THE COURT:  Did you just say he was terminated?

9         MS. ANDERSON:  Sorry?  Oh, I'm so sorry.  No.

10   Under threat of termination.  He believed he was going to be

11   terminated.  And 3M, you know, had had the federal mandate

12   up and lifted and perhaps would have, but he believed

13   sincerely that he was going to be terminated because of his

14   religious beliefs and his objections to the vaccine.

15        THE COURT:  So my understanding from the, my

16   reading of the complaint is -- you've used the word

17   "religious objection was denied," but my reading of the

18   exhibits is a bit different, which is that they asked, 3M

19   wanted more information from him and while it was pending,

20   before they made a final decision on his objection, then the

21   mandate was lifted.

22        Do you find those to be at odds?

23        MS. ANDERSON:  I believe that they did eventually

24   not grant the exemption, but they -- but they ultimately

25   never granted -- excuse me -- they never granted the

1  religious exemption either.  And so he still believed that

2  he was under threat of termination.

3          THE COURT:  Even after the mandate was lifted?

4          MS. ANDERSON:  No, Your Honor.  At that point he

5  understood there was no longer a threat of termination, but

6  up until that point there was.  And even after they lifted

7  the mandate, there was still constant pressure from 3M to

8  get vaccinated.

9          THE COURT:  And, again, I'm -- that is true that

10 pressure was true both for him, and at least there's nothing

11 in the complaint indicating that the person who sat next to

12 him or had an office next to him or worked next to him, who

13 didn't have a religious objection, wasn't subject to the

14 same emails, intimidation, et cetera.

15         MS. ANDERSON:  It's true it was a company-wide

16 policy, but it just really impacted people who had those

17 sincere religious objections and were trying to go through

18 the recourse to get those exemptions and believed that they

19 were going to be terminated because they could not comply.

20         THE COURT:  And one moment.

21         Under Title VII law and particularly some of the

22 cases that are cited in the defense brief, this theory that

23 general pressure to be vaccinated, even under threat of

24 termination, if not linked to age or religious belief or

25 another protected class, isn't a viable theory, how do you

1    respond to those cases?

2         MS. ANDERSON:  Well, I think the cases that

3    defendant cites, first of all, don't, don't put the

4    plaintiff under pressure of termination.  They don't have to

5    do with a company policy that would result in the employee's

6    termination because of those sincere beliefs or whatever

7    protected class they were part of.

8         The most analogous case is the *McManus versus*

9    *Department of Homeland Security* in Virginia that has to do

10   with the COVID mandate.  And the employer had put up that

11   clock, the countdown clock to get vaccinated; but in that

12   case the plaintiff had brought age discrimination, and in

13   that case it was clear there was no causal connection

14   between his age and the fact that this clock and the

15   constant pressure was present.

16        In this case, however, we have sincere religious

17   objections.  He sought a religious belief.  That creates

18   that causal connection because of his sincere religious

19   objections to the vaccine, his seeking of religious

20   exemption, 3M's knowledge that he had that exemption, and

21   then the continuous pressure to get the vaccine, to the

22   extent that he experienced severe anxiety, had to seek out

23   outside help and counsel to deal with his anxiety.  It

24   created that atmosphere of pressure, of coercive conduct, of

25   harassment that he experienced at 3M during that time.

1      THE COURT:  So I guess I'm not seeing in the

2  complaint the link between -- or any allegation that the

3  harassment was individual to him, aimed at him versus

4  company, versus the entire company.  In other words, I don't

5  see any allegations that the emails were directed at him

6  because they knew he had filed for exemption.

7      MS. ANDERSON:  Well, as I understand, the emails

8  were company-wide, yes, but they still, you know, under 3M's

9  direction were sent to him.

10      And, you know, we would seek leave to amend the

11  complaint to perhaps include some ongoing conversations with

12  Mr. Clobes and supervisors and all of that to maybe show a

13  little bit more how he interacted directly with his, with

14  management at 3M.

15      THE COURT:  All right.  Thank you.

16      Mr. Martin.

17      MR. MARTIN:  Thank you, Your Honor.

18      If we look at the complaint here, in

19  September 2021 3M moved ahead with its vaccine mandate in

20  the wake of the Federal Contractor Mandate.  Mr. Clobes on

21  November 18th made his request for religious exemption.  And

22  then, you know, the complaint is pretty clear on

23  December 10th the vaccine mandate was lifted.

24      Now, I know there was talk about it being refused.

25  The actual -- you know, if you look at the complaint, rather

1    than the brief, it's clear that it was never refused and

2    that it was actually still pending, based both on Exhibit B

3    and on the complaint.  And if the court has any doubts about

4    that, the actual charge that Mr. Clobes filed, it's not in

5    the record, but, you know, it's embraced by the pleadings.

6              THE COURT:  The EEOC charge?

7              MR. MARTIN:  The EEOC charge.  And I do have clean

8    copies for both the court and opposing counsel, if you want

9    them.

10             THE COURT:  Sure.

11             MR. MARTIN:  It says, "I requested an exemption to

12   the respondent's COVID-19 vaccination mandate that was in

13   the process of approval at the time the mandate was lifted."

14             THE COURT:  Right.  I think I reconcile these

15   tensions by -- I think it was under -- it sounds like it was

16   under advisement --

17             MR. MARTIN:  Correct.

18             THE COURT:  -- which means that it is correct to

19   say that it wasn't granted; maybe not correct to say that it

20   was refused, but certainly not granted.  And I think

21   everybody's in agreement that it was under advisement and

22   they'd asked for more information about it and then it was

23   lifted.  And so I'm not sure that it's critical to the

24   analysis.

25             What I'm hearing today is that the stress and

1    anxiety was twofold, one, before the religious exemption

2    because he felt like he would be terminated and, two, after

3    the vaccination requirement was lifted, the pressure,

4    nonetheless.

5            MR. MARTIN:  Right.  Yeah.  And the operative

6    facts really are they're claiming two things.  It's the

7    loudspeaker and email announcements about vaccines, and it's

8    also the having to wear a mask.

9            And if we look at those -- the complaint here

10   alleges two claims.  One is religious discrimination under

11   the MHRA; one is religious discrimination under Title VII.

12   There are no separate claims for harassment, but I briefed

13   them as if there was because there were allegations within

14   those counts for harassment.

15           So, you know, if the court has questions about the

16   distinctions, I know we have two arguments on why the

17   discrimination claim fails, namely, no adverse action and

18   nothing that's plausibly pled that creates an inference of

19   discrimination.  And then we similarly have two arguments on

20   harassment, you know, once again, no harassment because of

21   religion and then the severe or pervasive.  So they're

22   pretty similar issues, the severe or pervasive versus

23   adverse action.  I mean, I know they're different tests,

24   but, you know --

25           And I will say that, you know, there's no case

1    that says that anything close to this is an adverse action.

2    I mean, you look at the test in the Eighth Circuit, and it's

3    an adverse action is, quote, "a tangible change in working

4    conditions that produces a material employment disadvantage"

5    to the plaintiff.  Nothing of the like happened here.

6         You know, the example letter given in the Eighth

7    Circuit are termination, demotion, transfer with change in

8    pay and negative evaluations.  We have nothing close to that

9    here.  We had a request that was pending.  We had some

10   emails that said, Hey, you know, it would be nice if

11   everybody gets vaccinated, and you have, you know, similarly

12   over the loudspeaker.

13        But I think the court is right to focus in on the

14   lack of a link.  And I think if we look at that Exhibit B,

15   it really shows that there's a lack of a link, because it

16   talks about how Mr. Clobes in making his request says,

17   basically, I've had to put up with these emails for

18   18 months about getting vaccinated.  And that just shows

19   that the emails had nothing to do with his religious

20   request, which was just being made in the fall of 2021

21   versus the past 18 months when he said he was getting these

22   emails and loudspeaker announcements, which apparently

23   continued after.  But to me it really shows that none of

24   this was targeted at him and that he had had this for

25   18 months before he even raised his hand and said

1    "religion," which I find to be quite telling and makes it

2    pretty impossible to have, you know, any sort of link

3    between him claiming a religious exemption and these email

4    announcements.

5            The masking is the masking.  I mean, people were

6    subject to it.  And, you know, having to wear a mask is not

7    any marker that somebody has a religious exemption.  There's

8    lots of reasons people wear masks, some for added

9    protection, some for medical, some, you know -- we just

10   can't say that that was limited there and, you know, to

11   folks who had a religious exemption.

12           THE COURT:  I don't have any other questions for

13   you.

14           MR. MARTIN:  Okay.

15           THE COURT:  Not that you're not welcome to make

16   more argument.  I just --

17           MR. MARTIN:  No.  I mean, I do think -- you know,

18   there's a body of case law pre-COVID, and I think there's a

19   body that's emerging, you know, in-COVID or post-COVID or

20   wherever we're at right now, you know, but the cases are

21   coming out in favor on this.  You know, there's the *Sharikov*

22   case that we cited in our materials.  There's the *McManus*

23   case.  There's the *Leake* case.  And there are issues in

24   there that are pretty on point to what we have here.

25           So thank you, Your Honor.

1              THE COURT:  Thank you.

2              Ms. Anderson, I did neglect to ask you about the

3      hostile work environment claim.  And so I'm curious whether

4      your complaint encompasses both a discrimination case claim

5      that requires adverse employment action and a hostile work

6      environment claim?

7              MS. ANDERSON:  It does, Your Honor.

8              THE COURT:  Okay.

9              MS. ANDERSON:  Yes.  Yes, we intended to allege a

10     hostile work environment claim.

11             THE COURT:  All right.  Is there anything else

12     that you want to say in rebuttal?

13             MS. ANDERSON:  Yes, just to respond to a few

14     points.

15             You know, it was much more than a suggestion to

16     get vaccinated.  It was a requirement to get vaccinated

17     under threat of losing your livelihood.  And he had worked

18     there for a very long time, had invested a lot in this

19     company, and now was being threatened to lose that based off

20     of how they ruled on his exemption request, and a lot of

21     people's exemption requests were being denied, and, you

22     know, that was an ongoing discussion.

23             In terms of wearing the mask, that was a

24     requirement only for unvaccinated individuals.  So in some,

25     you know, to some extent you were being ousted to your

1    fellow co-workers if you were required to wear a mask.  And,

2    you know, that can create also a hostile environment when

3    you have people who are very adamant about getting

4    vaccinated.

5         And opposing counsel mentioned about, you know, he

6    didn't seek exemption until November.  There was no mandate

7    until September.  There was no process to seek an exemption

8    until September or until 3M announced it.  And there would

9    have been no reason for him to discuss his religious beliefs

10   with his co-workers, with his supervisors until that time.

11   So there was no legitimate reason for 3M to know about them

12   until that time; but once they were released, 3M was fully

13   aware of his religious objections to the vaccine and the

14   pressure continued regardless.

15        I would just also like to point out, you know, the

16   Supreme Court held Title VII's prohibition does not, is not

17   limited to just economic or tangible discrimination.  That's

18   why this hostile work environment claim exists.  And, you

19   know, the Supreme Court has also been clear that it doesn't

20   have to -- harassing conduct doesn't have to lead an

21   employee to an emotional breakdown in order to be

22   actionable.

23        And in this case you had somebody who did have

24   severe anxiety over this situation, who did have sincere

25   religious objections and had communicated those to the best

1    of his ability.  And, you know, an employer does not have to

2    bring the employee's psychological well-being and under

3    severe threat in order for a Title VII claim to be brought.

4              THE COURT:  Thank you.

5              MS. ANDERSON:  Thank you, Your Honor.

6              THE COURT:  Having reviewed the complaint and the

7    memoranda that you all have prepared and your argument here

8    today, I have no doubt that this situation caused stress.

9    It caused stress all over the country, because we were all

10   dealing with the vaccination status of each other and that

11   was an employment issue for many, many people; but the facts

12   in this complaint do not rise to the level of a federal

13   claim.

14             And I'm going to make my ruling from the bench.  I

15   will follow it up with a brief order.

16             It is as follows:  First, the legal standard.  To

17   survive a motion to dismiss under Rule 12(b)(6), the

18   complaint must contain enough facts to state a claim to

19   relief that is plausible on its face.  That comes from

20   *Twombly*.  A claim has facial plausibility when the plaintiff

21   pleads factual content that allows the court to draw the

22   reasonable influence that the defendant is liable for the

23   misconduct alleged.  At this stage in the litigation, the

24   court accepts as true all factual allegations in the

25   complaint, draws all reasonable inferences in the

1    plaintiff's favor.  Factual allegations in the complaint

2    need not be detailed, but they must be enough to raise a

3    right to relief above a speculative level.  Again, that is

4    from *Twombly*.

5            Mr. Clobes has brought a religious discrimination

6    claim under both Title VII and the MHRA.  In construing the

7    MHRA, which these federal courts do all the time in this

8    district, courts apply both Minnesota case law and the law

9    developed in federal cases arising under Title VII of the

10   1964 Civil Rights Act.  That statement comes from *Fletcher*

11   *v. St. Paul Pioneer Press*, 589 N.W.2d 96, Minnesota Supreme

12   Court 1999.

13           So I'm going to address both the religious

14   discrimination claims and the hostile work environment

15   claims.

16           As to religious discrimination, to establish a

17   prima facie case, Mr. Clobes must show that he's a member of

18   the protected class; he was meeting the legitimate

19   expectations of his employer; he suffered an adverse

20   employment action; and similarly situated employees who were

21   not members of the protected class were treated differently.

22   That comes from *Singletary versus Missouri Department of*

23   *Corrections*, 423 F.3d 886, at Eighth Circuit 2005.

24           Although a plaintiff need not plead facts

25   establishing a prima facie case for their Title VII

1    discrimination claim at the pleading stage, the elements of

2    a prima facie case are part of the background against which

3    a plausibility determination should be made and may be used

4    as a prism to shed light on the plausibility of the claim.

5    And that comes from *Blomker v. Jewell*, 831 F.3d 1051, Eighth

6    Circuit 2016.  Thus, the allegations in a complaint must

7    give plausible support to the reduced prima facie

8    requirements that arise under *McDonnell Douglas*.  And that

9    is *Warmington versus Board of Regents of the University of*

10   *Minnesota*, 998 F.3d 789, Eighth Circuit 2021.

11          Here, the amended complaint -- actually, it's a

12   verified complaint -- fails to allege facts plausibly

13   supporting the third and fourth elements of the religious

14   discrimination claim, and those are adverse employment

15   action and inference of discrimination.

16          As to the adverse employment action, that means

17   termination, demotion, transfers involving changes in pay or

18   working conditions and negative evaluations used as the

19   basis for other employment action.  That comes from *Huynh*

20   *versus United States DOT*, 794 F.3d 952.  Accepting the

21   statements in the complaint as true, Mr. Clobes did not

22   suffer any adverse employment actions.  At most, he claims

23   to have felt pressured to get a vaccination or singled out

24   for having to wear a mask.  Those are not adverse employment

25   actions.  In *Harlston versus McDonnell Douglas Corp.*, which

1    is 37 F.3d 379, the Eighth Circuit noted that changes in

2    duties or working conditions that establish or cause no

3    materially significant disadvantage are insufficient to

4    establish adverse conduct required to make a prima facie

5    case.  Put another way, not everything that makes an

6    employee unhappy is an actionable adverse employment action.

7    And that's from *LaCroix versus Sears, Roebuck*, 240 F.3d 688,

8    Eighth Circuit 2001.  So there's no adverse action, meaning

9    no prima facie case.

10          There is also no inference of discrimination that

11   can be gleaned from the complaint.  That is the fourth

12   element of the prima facie case.  He has not pled that 3M

13   treated similarly situated employees outside the protected

14   class of religious objectors differently.  There's nothing

15   in the complaint supporting an inference of discrimination.

16   The masking requirement was tied to his vaccination status,

17   not his religion.  Because there was no claim that employees

18   with other reasons for remaining unvaccinated were treated

19   differently, Mr. Clobes fails to plead circumstances giving

20   rise to an inference of discrimination.

21          Thus, because he fails to meet two elements of the

22   prima facie case, his claims are not plausible under *Iqbal*

23   and *Twombly* and they must be dismissed.

24          As to the hostile work environment.  For this

25   claim as well, the court analyzes it under Title VII's

1      framework.  Under Minnesota law, *LaMont versus Independent*

2      *School District*, 814 N.W.2d 14, Minnesota Supreme Court

3      2012, uses the Title VII framework to bolster its holding in

4      an MHRA lawsuit relying on language that federal court

5      decisions are instructed and have been applied by the

6      Minnesota Supreme Court when construing the MHRA.

7              All right.  As to the hostile work environment.

8      To establish that claim, Mr. Clobes must prove that he was

9      the target of severe or pervasive harassment on account of

10     his religion, that the harassment affected a term, condition

11     or privilege of his employment and that 3M knew or should

12     have known of the racial -- or sorry -- of the religious

13     harassment and failed to take adequate remedial measures.

14     That comes from *Woodland versus Joseph T. Ryerson & Son*, 302

15     F.3d 839, Eighth Circuit 2002.  Conduct that is not severe

16     or pervasive enough to create an objectively hostile or

17     abusive work environment -- an environment that a reasonable

18     person would find hostile or abusive -- is beyond

19     Title VII's purview.

20              The complaint alleges nothing that links

21     Mr. Clobes' religion to 3M's efforts to ensure its employees

22     were vaccinated against COVID.  For example, there are no

23     allegations that assert 3M's emails and other communications

24     about vaccines had anything to do with his religion or in

25     fact were directed at him individually.

1       The complaint also does not allege conduct that is

2   severe or pervasive sufficient to support a hostile work

3   environment theory.  There are two failings that fall in

4   this category.  First is the email and loudspeaker

5   announcement referenced in the complaint.  Those are not

6   severe or pervasive enough to support a hostile work

7   environment claim.  Second, Clobes does not allege that

8   these actions were targeted specifically at him.  Several

9   courts, noted in the defendant's opening brief at pages 12

10  and 13, have concluded similarly.  The court notes in

11  particular the recent case of *Leggo v. M.C. Dean*, 2023

12  Westlaw 1822383 out of the Eastern District of Virginia,

13  decided earlier this year, which is, of course, not binding

14  on this court, but I do find its reasoning persuasive.

15      So accepting as true what I said at the outset

16  that Mr. Clobes, like many other employees around the

17  country, felt pressured to receive the vaccination and that

18  he felt uncomfortable with both that pressure and with the

19  mask requirement, the circumstances do not as a matter of

20  law create a hostile work environment.  So 3M's motion to

21  dismiss the hostile work environment claim is granted.

22      Now, Ms. Anderson, I understand that you and your

23  client have asked for leave to amend the complaint in the

24  event that the court finds that the current complaint fails

25  the plausibility standard, which the court has just

1    concluded.  I'm not seeing any additional facts that you've

2    identified that would establish a viable claim, and there is

3    no submitted proposed amended complaint, which is required

4    by Local Rule 15.1(b).  So I am denying the request for

5    leave to amend.

6            In *O'Neil v. Simplicity, Inc.*, the Eighth Circuit

7    has noted -- and that's at 574 F.3d 501 -- a district court

8    does not abuse its discretion in denying leave to amend

9    where a plaintiff has not followed applicable procedural

10   rules.  More importantly, I simply can't guess at what might

11   be alleged to determine whether the amendment might be

12   futile.  And for that I cite *Meehan versus United Consumers

13   Club Franchising Corp.*, 312 F.3d 909, Eighth Circuit 2002,

14   noting that a district court in such a situation is not

15   required to engage in a guessing game.  I will, however,

16   decline the request by the defendant to dismiss the

17   complaint with prejudice, and I'm dismissing it without

18   prejudice.

19           My written order will state that for the reasons

20   that I have just gone through on the record that 3M's motion

21   to dismiss is granted and the case is dismissed without

22   prejudice and judgment will be entered.

23           I thank you for your arguments here today.  And

24   with that, I'm concluding the hearing, unless there's

25   anything else from the plaintiff.

1                Ms. Anderson?

2                MS. ANDERSON:  Nothing, Your Honor.

3                THE COURT:  Thank you.

4                Mr. Martin, from the defense?

5                MR. MARTIN:  Nothing, Your Honor.

6                THE COURT:  Thank you, everyone.

7                THE CLERK:  All rise.  Court is in recess.

8            (Court adjourned at 2:00 p.m., 04-20-2023.)

9                              *   *   *

10          I, Renee A. Rogge, certify that the foregoing is a

11     correct transcript from the record of proceedings in the

12     above-entitled matter.

13                     Certified by:  /s/Renee A. Rogge
                                      Renee A. Rogge, RMR-CRR
14

15

16

17

18

19

20

21

22

23

24

25